# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# WAYCROSS DIVISION

| | |
|---|---|
| LATISHA JOHNSON, on behalf of her minor child K.J.J., | |
| Plaintiff, | CIVIL ACTION NO.: 5:16-cv-107 |
| v. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff contests the decision of Administrative Law Judge Craig R. Petersen ("the ALJ" or "ALJ Petersen") denying her son's claim for Supplemental Security Income benefits. Plaintiff urges the Court to reverse the ALJ's decision and award benefits, or, in the alternative, to remand the case to the ALJ for a proper determination of the evidence. Defendant asserts the Commissioner's decision should be affirmed. For the reasons which follow, I **RECOMMEND** the Court **AFFIRM** the Commissioner's decision. I also **RECOMMEND** that the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.

## BACKGROUND

Plaintiff filed an application for a Supplemental Security Income benefits on behalf of her son on September 4, 2013, alleging that he became disabled on July 15, 2011, due to asthma. (Doc. 9-2, p. 40.) After the claim was denied initially and upon reconsideration, Plaintiff filed a

---

[1] The Court **DIRECTS** the Clerk of Court to change the name of the Acting Commissioner from Carolyn W. Colvin to Nancy A. Berryhill upon the record and docket of this case.

timely request for a hearing. On September 18, 2014, ALJ Petersen conducted a video hearing while presiding in Savannah, Georgia, with Plaintiff appearing in Waycross, Georgia. (Id.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision, and the decision of the ALJ became the final decision of the Commissioner for judicial review. (Doc. 9-2, p. 3.)

Plaintiff, born on June 15, 2011, was four (4) years old when ALJ Petersen issued his final decision. (Id. at p. 58; Doc. 16, p. 2.)

## DISCUSSION

### I. The ALJ's Findings

The Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104-193, § 211, 110 Stat. 2105 ("Reconciliation Act") amended 42 U.S.C. § 1382c(a)(3) and altered both the statutory definition of childhood disability and the framework for determining such a disability. The Reconciliation Act applies to children who filed disability claims on or after August 22, 1996, as well as to applicants whose cases were not finally adjudicated by that date. 110 Stat. 2105, § 211(d)(1)(A)(ii). Under this Act, a child's impairment or combination of impairments must cause more serious impairment-related limitations than the prior regulations required. 62 Fed. Reg. 6408, 6409 (Feb. 11, 1997).

Under the Reconciliation Act, a child under the age of eighteen is considered disabled if "that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations implementing the new standards provide the following three-step sequential process that must be followed by the ALJ in determining whether a child is entitled to benefits: (1) Is the child engaged in substantial gainful activity? If yes, the child is not disabled. If no, then: (2) Does the

child have a severe impairment? If no, then the child is not disabled. If yes, then: (3) Does the impairment medically meet or functionally meet a listed impairment in Appendix 1? If yes, the child is disabled. 20 C.F.R. §§ 416.924(a)–(d); see also Wilson v. Apfel, 179 F.3d 1276, 1278 n.1 (11th Cir. 1999). In reaching this determination, the ALJ considers information from medical sources and non-medical sources, as well as the child's age. 20 C.F.R. §§ 416.924a(a) & 416.924b.

If a child's impairment does not medically meet a listed impairment, the ALJ must determine whether the child "'functionally equal[s] the listings,'" i.e., the child's "impairment(s) must result in a listing-level severity—'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). If a child has "marked" limitations in two domains or an "extreme" limitation in one domain, the child's impairment is functionally equivalent to a listed impairment. 20 C.F.R. § 416.926a(d). A "marked" limitation is one that "interferes seriously" with a claimant's abilities in a domain, and an "extreme" limitation is one that "interferes very seriously." 20 C.F.R. §§ 416.926a(e)(2) & (3). The domains an ALJ uses are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

ALJ Petersen classified Plaintiff's son as an "older infant" as of the date his application was filed and noted he was a preschooler on the date of the ALJ's decision. The ALJ found Plaintiff's son had not engaged in substantial gainful activity since the application date and had asthma as a severe impairment. (Doc. 9-2, p. 43.) However, ALJ Petersen determined K.J.J.'s asthma did not meet or medically equal the requisite severity of a listed impairment, nor did his asthma functionally equal the requisite severity of a listed impairment. (Id. at p. 50.)

## II. Issues Presented

Plaintiff contends the ALJ erred by improperly discounting the opinions of K.J.J.'s treating pulmonologist and of other doctors to find K.J.J. did not meet or equal Listings 103.03B and/or 103.03C or functionally equal either of these Listings. (Doc. 15, p. 3.)

## III. Standard of Review

It is well-established that judicial review of social security cases is limited to questions of whether the Commissioner's factual findings are supported by "substantial evidence," and whether the Commissioner has applied appropriate legal standards. Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A reviewing court does not "decide facts anew, reweigh the evidence or substitute" its judgment for that of the Commissioner. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). Even if the evidence preponderates against the Commissioner's factual findings, the court must affirm a decision supported by substantial evidence. Id.

However, substantial evidence must do more than create a suspicion of the existence of the fact to be proved. The evidence relied upon must be relevant evidence which a reasonable mind would find adequate to support a conclusion. Ingram v. Comm'r of Soc. Sec. Admin., 496 F. 3d 1253, 1260 (11th Cir. 2007). The substantial evidence standard requires more than a scintilla but less than a preponderance of evidence. Dyer, 395 F.3d at 1210. In its review, the court must also determine whether the ALJ or Commissioner applied appropriate legal standards. Failure to delineate and apply the appropriate standards mandates that the findings be vacated and remanded for clarification. Cornelius, 936 F.2d at 1146.

The deference accorded the Commissioner's findings of fact does not extend to her conclusions of law, which enjoy no presumption of validity. Brown v. Sullivan, 921 F.2d 1233,

1236 (11th Cir. 1991) (holding that judicial review of the Commissioner's legal conclusions are not subject to the substantial evidence standard). If the Commissioner fails either to apply correct legal standards or to provide the reviewing court with the means to determine whether correct legal standards were in fact applied, the court must reverse the decision. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982), *overruling by statute on other grounds recognized by* Lane v. Astrue, No. 8:11-CV-345-T-27TGW, 2012 WL 292637, at *4 (M.D. Fla. Jan. 12, 2012).

**IV.     Whether Substantial Evidence Supports the ALJ's Finding That K.J.J. Does not Meet or Equal Listings 103.03B or 103.03C**

Plaintiff contends ALJ Petersen erred by not following the opinions of Dr. Gordana Lovrekovic, K.J.J.'s treating pulmonologist. Plaintiff asserts the ALJ did not give Dr. Lovrekovic's opinions the deference they deserve since she is K.J.J.'s treating doctor, and the ALJ cited no medical evidence to support his finding that Plaintiff's son did not meet or equal a Listing. (Doc. 15, p. 25.) Plaintiff contends ALJ Petersen should have contacted Dr. Lovrekovic for clarification if he had questions regarding her opinion or should have contacted Plaintiff's counsel to seek this clarification. (Id.) Instead, Plaintiff asserts ALJ Petersen sent her son to Dr. Angela Battle for a one-time consultative examination. (Id. at p. 27.)

The Commissioner maintains the ALJ was not required to rely on Dr. Lovrekovic's opinion that her son's asthma met a Listing, as that determination is reserved for the ALJ. (Doc. 16, p. 5.) Defendant states the ALJ gave consideration to Dr. Lovrekovic's opinion but discounted it as being inconsistent with her own treatment notes. In fact, the Commissioner notes Dr. Lovrekovic's examinations "repeatedly revealed normal findings", and it was Plaintiff's mother who provided information regarding "various triggers, a history of worsening symptoms, and seven courses of oral steroids[.]" (Id. at p. 6.) Defendant avers the ALJ had

5

more than enough evidence before him to make an informed and proper determination of K.J.J.'s disability and had no need to re-contact Dr. Lovrekovic. (Id. at pp. 6–7.)

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178–79 (11th Cir. 2011) (alteration in original) (quoting 20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2)). "The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citations omitted).

"Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" Winschel, 631 F.3d at 1179 (quoting Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004)). "The ALJ has wide latitude to determine what weight to assign to those opinions, so long as he operates within the regulatory and judicial frameworks." Zanders v. Colvin, No. CV412-182, 2013 WL 4077456, at *5 (S.D. Ga. Aug. 12, 2013). "For instance, when discounting a medical opinion, he should consider several factors, including the examining relationship, the treatment relationship, the doctor's specialization, whether the opinion is amply supported, and whether the opinion is consistent with the record." Id. (citing 20 C.F.R. §§ 404.1527(c) & 416.927(c)). "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." Winschel, 631 F.3d at 1179 (citation omitted). Failure to "clearly articulate the

reasons for giving less weight to the opinion of a treating physician" is "reversible error." Lewis, 125 F.3d at 1440 (citation omitted).

### A. The ALJ's Findings as to Whether K.J.J. Meets or Equals Listings 103.03B and 103.03C

"The Listing of Impairments describes, for each major body system, the impairments that are considered severe enough to prevent a person from doing any gainful activity." Mabrey v. Acting Comm'r of Soc. Sec. Admin., No. 17-12414, 2018 WL 679390, at *2 (11th Cir. Feb. 2, 2018) (citing Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002)). "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the Listing's specific criteria and duration requirement. To 'equal' a Listing, the medical findings must be at least equal in severity and duration to the listed findings." Id. (citations omitted). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Arrington v. Soc. Sec. Admin., 358 F. App'x 89, 93 (11th Cir. 2009) (citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). The evidentiary standards for presumptive disability under the Listings are stricter than for cases that proceed to other steps because the Listings represent an automatic screening based on medical findings rather than an individual judgment based on all relevant factors in a claimant's claim. See 20 C.F.R. §§ 416.925, & 416.926a; see also Zebley, 493 U.S. at 530–32.

To meet Listing 103.03B, a claimant must have asthma with "[a]ttacks (as defined in 3.00C)[2], in spite of prescribed treatment and requiring physician intervention, occurring at least

---

[2] Listing 3.00C defines asthma attacks as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalization for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a

7

once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months may be used to determine the frequency of attacks[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 103.03B.[3] To meet Listing 103.03C(2), a plaintiff must suffer from "'persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with . . . [s]hort courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period." Johnson v. Barnhart, 148 F. App'x 838, 841 (11th Cir. 2005) (alteration in original) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 103.03C(2)).

ALJ Petersen determined K.J.J. did not meet or equal any of the respiratory Listings because the results from his pulmonary function tests did not meet the requirements of those Listings. Specifically, the ALJ noted K.J.J. did not require mechanical ventilation or nocturnal supplemental oxygen, nor did he have bronchopulmonary dysplasia or weight disturbance. (Doc. 9-2, p. 50.) Additionally, the ALJ noted Plaintiff's son did not have two or more hospital admissions which lasted longer than twenty-four (24) hours within a six-month period due to recurrent lower respiratory tract infection. Moreover, ALJ Petersen observed K.J.J. did not experience any asthma attacks, as defined in Listing 3.00C, in spite of prescribed treatment and requiring physician intervention, which occurred at least once every two months or at least six times in a year. (Id.) The ALJ remarked that K.J.J.'s medical records did not support any assertion he had persistent, low-grade wheezing between acute attacks with either prolonged

---

description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00C.

[3] The Court's citations to the Code of Federal Regulations are to those Regulations in effect at the time ALJ Petersen rendered his determination.

expiration and x-ray evidence of hyperinflation of peribronchial disease or short courses of corticosteroids averaging more than five days per month for at least three months during a twelve-month period. ALJ Petersen observed that, although K.J.J. was seen in the emergency room "with reports of asthma," his treatment records indicate he was seen for seasonal allergies or upper respiratory infections. (Id.) Further, ALJ Petersen noted the majority of K.J.J.'s physical examinations revealed that his lungs were clear, and there was no evidence of wheezing. Additionally, ALJ Petersen noted that K.J.J. did receive treatment with steroids in the emergency room, yet the record failed to document steroid treatment for an average of more than five days a month for at least three months during a twelve-month period. (Id.)

In reaching his finding that Plaintiff's son's asthma did not meet or equal a Listing, ALJ Petersen looked to K.J.J's medical records, which began in early 2012.[4] Of note, ALJ Petersen pointed to K.J.J.'s visit to the emergency room on June 1, 2013, during which it was reported that he was wheezing at night with improvement during the day, was coughing, and had nasal congestion. However, ALJ Petersen observed these reports were "[i]nconsistent" with K.J.J.'s physical examination, which disclosed that his lungs were clear with normal breath sounds and no respiratory distress. (Id. at p. 44.) The ALJ noted Plaintiff's report to Dr. Stanley Jones on March 1, 2013. that her son had had wheezing, coughing, and a runny nose for the past week was inconsistent with his visit with Dr. Melvin Haysman the day before, during which Plaintiff reported her son was "doing much better[,] with no symptoms of stuffiness, congestion, wheezing, or shortness of breath." (Id. at pp. 44–45.) Moreover, ALJ Petersen observed Plaintiff's reports of improvement to Dr. Haysman were inconsistent with her reports to Dr.

---

[4] The Court need not recount every medical record ALJ Petersen cited to in his opinion over the course of more than six (6) single-spaced pages. The parties sufficiently recounted K.J.J.'s medical records and are well-familiar with the ALJ's determination. The Court cites to relevant portions of the ALJ's determination and the record.

Lovrekovic of March 11, 2013, that K.J.J.'s condition was worsening. (Id. at p. 45.) ALJ Petersen also found Plaintiff's reports of the severity of K.J.J.'s symptoms were inconsistent with his physical examination, which revealed that his lungs were normal with normal breath sounds.

The ALJ noted Plaintiff reported K.J.J. had a runny nose, wheezing, a cough, and fever and that his asthma "was bad[]" in a September 2013 visit to The Pediatric Center. (Id.) While the examination revealed nasal congestion, K.J.J.'s lungs were clear, and he was diagnosed with having an upper respiratory infection. (Id.) ALJ Petersen recounted several of K.J.J.'s medical visits during the remainder of the year 2013 and into 2014, and K.J.J.'s physical examinations largely yielded normal findings, including clear lungs. (Id. at pp. 45–46.) As an exception to this generalization, the ALJ noted K.J.J.'s lungs showed prolonged expiration in both lung fields during Dr. Lovrekovic's March 11, 2014 examination. (Id. at p. 46.)

ALJ Petersen noted Dr. Lovrekovic's physician statement of March 12, 2014, in which Dr. Lovrekovic opined K.J.J. met the requirements of Listing 103.03C(2). ALJ Petersen pointed to Dr. Lovrekovic's indications that K.J.J. had "frequent asthma exacerbation requiring an increase in his therapy . . . over the past year[;]" and "persistent, moderate asthma that was not well controlled[;] and that he "required oral steroids, mostly prescribed by emergency room personnel or his pediatrician." (Id. (citing Doc. 9-11, p. 76).) The ALJ gave "little weight" to these statements, as he found them to be inconsistent with Dr. Lovrekovic's own treatment notes, which indicated K.J.J.'s symptoms "were under better control." (Id.)

In addition, the ALJ observed Dr. Angela Battle's consultative evaluation of October 13, 2014, during which time Plaintiff described K.J.J. had been having frequent episodes of asthma, yet she also reported K.J.J. was not as frequently sick as he had been since he was no longer attending daycare. (Id. at p. 47.) Dr. Battle concluded K.J.J. had moderate, persistent asthma that

was not well-controlled, which ALJ Petersen remarked was inconsistent with Dr. Lovrekovic's treatment notes, which indicated K.J.J. had "good control" of his asthma with Advair. (Id.) ALJ Petersen noted he gave Dr. Battle's opinions "generally" "significant weight", with the exception of her opinion regarding the severity and limiting effects of K.J.J.'s asthma. (Id. at p. 48.) Specifically, the ALJ stated Dr. Battle found K.J.J. had no limitations in any of the domains (discussed below), with the exception of health and physical well-being. Dr. Battle determined K.J.J. had marked limitations in this domain because of his moderate asthma that was not well-controlled and which, according to Plaintiff, prevented K.J.J. from attending daycare. (Id. at pp. 47–48 (citing Doc. 9-12, p. 113).) ALJ Petersen found the record showed K.J.J.'s asthma was under good control and caused less than marked limitations in the domains of health and physical well-being and the ability to move about and manipulate objects. (Id. at p. 48.)

The ALJ recounted an asthma questionnaire completed in early 2015 in which it was noted K.J.J. was seen by a medical professional for urgent treatment of his asthma three to four (3-4) times a month and had been in the emergency room ("ER") at least five (5) times over the previous six-month period for asthma-related symptoms. The ALJ also noted this questionnaire conveyed that K.J.J. had not been able to attend school since November 2014[5] and that his parents had to miss work three to four (3-4) days a week to provide care for K.J.J. However, ALJ Petersen did not give "significant weight" to this questionnaire because the nurse who completed the form relied on Plaintiff's statements in completing the questionnaire. (Id.) Further, ALJ Petersen remarked Dr. Dennis Ownby's notes indicate Plaintiff was "overly cautious with regard" to K.J.J.'s health, considered K.J.J. to be sick if he had a runny nose, and

---

[5] The nurse wrote K.J.J had not been able to attend school since May 2014. (Doc. 9-14, p. 8.) The discrepancy between these dates is irrelevant, as ALJ Petersen determined that this questionnaire was not given significant weight due to the nurse's reliance on K.J.J.'s mother's reports.

felt the need to give him Albuterol several times daily, despite reports that he was doing fine on his medication. (Id. at pp. 48–49.)

Moreover, ALJ Petersen recounted Dr. Lovrekovic's statement from May 2015, in which she indicated Plaintiff reported K.J.J. had been hospitalized thrice in 2014 and had four (4) courses of steroids in 2015. The ALJ noted he did not give this statement "significant weight" because the records did not bolster K.J.J.'s hospitalization due to asthma on three (3) occasions in 2014, and K.J.J.'s steroid treatments in 2015 did not average more than five (5) days per month for at least three (3) months during a twelve-month period. (Id. at p. 49.) Additionally, ALJ Petersen observed Dr. Lovrekovic indicated K.J.J. may require frequent Albuterol nebulizations and may require hospitalization for airway control, and Dr. Lovrekovic noted K.J.J. received nebulizer treatments three (3) times a day for ten to fifteen (10-15) minutes' duration and would have episodic flare-ups which would prevent K.J.J. from participating in "normal activities twice a month for one to two days at a time." (Id.) ALJ Petersen did not give these statements "great weight" because they were inconsistent with Dr. Lovrekovic's own treatment notes and other evidence of record.

For instance, ALJ Petersen noted that, although Plaintiff reported frequent flare-ups of K.J.J.'s asthma, Dr. Lovrekovic's treatment records revealed K.J.J. had not displayed "significant symptoms" during these alleged episodes. (Id.) Additionally, the ALJ observed Dr. Lovrekovic's, Dr. Ownby's, and the ER doctors' records "frequently found [K.J.J.] displayed no symptoms of wheezing or respiratory distress." (Id.) Further, K.J.J. was described in medical records as being active and not in distress. ALJ Petersen noted Plaintiff considered K.J.J. to be sick if he had nasal congestion, which was consistent with treatment records showing K.J.J. was

12

"frequently reported" with having severe asthma but having nasal congestion and/or coughing as his only symptoms. (Id.)

Plaintiff does not present argument that her son meets or equals Listings 103.03B and/or 103.03C(2). Rather, Plaintiff's counsel presented the Court with pages of charts to recount her son's medical visits and argues the ALJ should have deferred to Dr. Lovrekovic's opinion. Plaintiff fails to show that ALJ Petersen's determination to give less weight to Dr. Lovrekovic's opinions is unsupported by substantial evidence. ALJ Petersen gave clear reasons for not accepting these opinions, thus establishing the "good cause" necessary to discount the opinions of K.J.J.'s treating physician. Thus, ALJ Petersen's determination that Plaintiff's son does not meet or equal Listings 103.03B or C(2) follows the proper legal requirements and is supported by substantial evidence. What is more, Dr. Lovrekovic's opinion that K.J.J. meets these Listings is not entitled to any more weight than the ALJ gave, as such a determination is reserved for the Commissioner. 20 C.F.R. § 416.927(d)(1). Moreover, ALJ Petersen was under no obligation to re-contact Dr. Lovrekovic, as he properly determined her findings and opinions should not be given great weight and had other evidence to use in reaching his determination. Sessarego v. Colvin, No. CV414-209, 2015 WL 10557872, at *5 n.11 (S.D. Ga. Nov. 20, 2015), *report and recommendation adopted*, 2016 WL 1258943 (S.D. Ga. Mar. 28, 2016) (citing 20 C.F.R. § 404.1520b(c)(1) for the proposition that the ALJ no longer has an obligation to re-contact a medical source and will, in his discretion, decide the best way to resolve inconsistencies or insufficiencies in the record). Accordingly, this enumeration of error is without merit.

### B. The ALJ's Findings on Whether K.J.J. Functionally Equals Listings 103.03B and/or 103.03C

As noted above, if a child's impairment does not medically meet a listed impairment, the ALJ must determine whether the child "functionally equal[s] the listings," i.e., the child's

"impairment(s) must result in a listing-level severity—"'marked' limitations in two domains of functioning or an "'extreme'" limitation in one domain." 20 C.F.R. § 416.926a(a). The domains an ALJ uses are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A "marked" limitation in a domain is when the impairment limits the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation in a domain is when the impairment interferes very seriously with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

ALJ Petersen observed Plaintiff's reports of the limiting effects of K.J.J.'s asthma were inconsistent with the evidence of record. Of note, the ALJ stated K.J.J.'s medical records did not reveal that any of his doctors placed long-term restrictions on him participating in normal activities; in fact, the majority of K.J.J.'s physical examinations revealed normal results with no evidence of physical limitations. Additionally, the ALJ remarked K.J.J.'s treatment records consistently revealed he tolerated his medications well with no adverse side effects, despite Plaintiff's testimony that K.J.J.'s medication caused hyperactivity. (Doc. 9-2, p. 52.) ALJ Petersen then turned to the six domains of functioning.

First, the domain of acquiring and using information pertains to how well a child is able to acquire or learn information and use the information he has learned; and how well a child perceives, thinks about, remembers, and uses information in all settings, including daily activities at home, at school, and in the community. 20 C.F.R. § 416.926a(g). ALJ Petersen stated neither Plaintiff nor K.J.J.'s treating physicians reported any limitations in this area. Thus, ALJ Petersen concluded K.J.J. had no limitation in this domain. (Doc. 9-2, pp. 52–53.)

The domain of attending and completing tasks involves how well a child is able to focus and maintain his attention and how well a child begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes activities. 20 C.F.R. § 416.926a(h). ALJ Petersen noted that the evidence before him did not indicate that K.J.J. had any limitations in his ability to attend and complete tasks. (Doc. 9-2, p. 54.)

Next, the domain of interacting and relating to others considers how well a child can: initiate and sustain emotional connections with others; develop and use the language of the community; cooperate with others; comply with rules; respond to criticism; and respect and take care of others' possessions. This domain considers the child's speech and language skills, which he needs to speak intelligibly and to understand and use the language of his community. 20 C.F.R. § 416.926a(i). ALJ Petersen found K.J.J. had no limitations in this domain, as there was no evidence or even an allegation of limitations in this domain. (Doc. 9-2, pp. 54–55.)

The domain of moving about and manipulating objects involves evaluating how a child moves his body from one place to another and moves and manipulates things (also known as gross and fine motor skills). Limitations in this domain can be associated with musculoskeletal and neurological impairments, other physical impairments, medications or treatments, or mental impairments. 20 C.F.R. § 416.926a(j). The ALJ found that K.J.J. had a "less than marked limitation" in this domain. (Doc. 9-2, pp. 55–56.) In so doing, ALJ Petersen discounted Plaintiff's reports that K.J.J. performed all normal activities for a child of his age but became short of breath with some activities and that prolonged participation in some activities could trigger asthma episodes, as Plaintiff's reports were inconsistent. Additionally, ALJ Petersen observed K.J.J.'s treatment records did not provide evidence that his condition had been

15

consistently severe enough to result in a marked or extreme limitation in this domain. (Doc. 9-2, p. 56.)

The fifth domain, a child's ability to care for himself, requires an ALJ to evaluate how well a child maintains a healthy emotional and physical state; gets physical and emotional wants and needs met in appropriate ways; copes with stress and environmental changes; and takes care of his health, possessions, and living area. 20 C.F.R. § 416.926a(k). The ALJ found that the record as a whole did not supply evidence of any limitation on K.J.J.'s part in this domain. (Doc. 9-2, pp. 56–57.)

Finally, in the domain of health and physical well-being, an ALJ addresses the cumulative physical effects of physical or mental impairments and the associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. In addition, unlike the other domains of functional equivalence, this domain addresses how recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's health and sense of physical well-being, rather than a child's abilities. 20 C.F.R. § 416.926a(*l*). The ALJ determined K.J.J. had less than marked limitation in this domain. Specifically, ALJ Petersen noted that, although K.J.J. was frequently taken to the ER with reports of respiratory distress and related symptoms, the records from his visits disclosed K.J.J. frequently did not display the alleged symptoms. In fact, ALJ Petersen remarked K.J.J. was described in these records "as being in no apparent distress, playing normally, or as [calm] or sleeping." (Doc. 9-2, p. 58.) The ALJ also noted K.J.J.'s records did not indicate he suffered any side effects from his medications. (Id.)

ALJ Petersen's determination that K.J.J. did not have an impairment or combination of impairments which resulted in either "marked" limitations in two domains of functioning or

"extreme" limitation in one domain of functioning, i.e., K.J.J. did not functionally equal Listing 103.03B or C(2), is supported by substantial evidence. As discussed herein, ALJ Petersen relied on the medical evidence of record in reaching his determination and had "good cause" to discount certain opinions of K.J.J.'s doctors. This enumeration of error is also without merit.

## CONCLUSION

Based on the foregoing, I **RECOMMEND** that the Court **AFFIRM** the decision of the Commissioner. I also **RECOMMEND** that the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the pleading must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action.

The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence. Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made

only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 5th day of March, 2018.

_____
R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA